Good morning, welcome to the 11th circuit. We're happy to have you here with us today. I think you're all familiar with our lighting system, but just a quick review. When the yellow light goes on, you have two minutes left. When the red light goes on, your time is up. We ask that you please respect that and wind up immediately. The only exception to that is if we've asked you a question, we do want to hear your answer. So even if it brings you over your time limit, we ask that you please do give us that answer. And with that, we will begin today with United States of America v. Jack Fisher. And we'll hear first from Mr. Cooney. Thank you, Your Honor. May it please the Court, I'm Jim Cooney of the Bar of the State of North Carolina. I represent the defendant, Jack Fisher, who is convicted on multiple felony counts arising out of what the government charged was a fraudulent scheme to inflate appraisals for purposes of improper tax deductions for conservation easements. Mr. Fisher was sentenced to 25 years in prison for this. While we've raised a number of issues in our brief, what I would like to do with my time today is focus the Court's attention on what we believe is the most compelling issue. And that is the improper removal of a juror during the fifth day of deliberations in this case. The removal of a juror during deliberations in a criminal case is one of those bright red lines in our jurisprudence. If it's ever done, it's only to be done rarely, and then only if certain standards are met. For the District Court, that standard is the District Court must determine with utmost certainty that there is no substantial possibility that the juror can decide the case based on the law or the evidence. Of course, you would agree, though, that if there were evidence that a juror was basing his or her determination on a racist outlook, that that would be grounds for removal. Yes. If there was a nexus between an express view and the juror said something in the jury room or expressed to the Court that I can't find somebody guilty because they're white or white people don't commit crimes or things like that, but I'd refer the Court to United States Against Thomas as well, which the Court cited in its en banc decision in Brown. In United States Against Thomas, an African-American juror in a drug case faced with African-American defendants said in the jury room, these are my people. But upon inquiry, the judge made a determination, and the judge actually ended up removing that  The Second Circuit found that was error because an expression of identity with the defendants doesn't mean there is no possibility the juror is not deciding the case based on the law and the evidence. What I'd like to do is to focus the Court on two points in time. One is September 18th, 2023. It's a Monday. It's the third day of deliberations. The second is September 20th, 2023, which is Wednesday, the fifth day of deliberations. That's when Ms. Johnson gets removed. But all of the facts the government points to, all of the allegations the government makes, all of the arguments the government makes were before the Court on the 18th. The Court conducted its inquiry. It heard those arguments. It considered those facts, and on the 18th, the Court concluded there was a substantial possibility that she would decide the case based on the evidence. What do we make of the fact that right after the judge conducted the interview of the juror and the comments about race came out, the judge, when he was discussing that conversation with the lawyers, didn't mention that that was a problem, and it seems to be only a couple of days later that the judge changes his mind? Are you questioning, is it permissible for the judge to have changed his mind? What are we supposed to make of that sort of turn of events? I appreciate that, Your Honor. Your Honor's correct when he immediately came out and summarized what he'd been told. He didn't even mention this because it didn't make an impact on him. But later that day, the government moved to reconsider because the government had gotten a transcript and saw those comments in the transcript, and so brought that back to the attention of the Court. So that was actually before the Court on the 18th and was still found not to be enough. So the issue for the Court, quite frankly, is nothing changed between the 18th and the 20th. And the facts on the 18th were not sufficient to make that no substantial possibility finding, but suddenly on the 20th, the Court removes the juror without any change in between. So we have the same facts now supporting two very different conclusions, and those conclusions can't exist together. Where in that sequence did the ex parte conversations happen? Were they, I can't recall which day those took place. They were all, they all took place on the 18th. There were no further interviews of Ms. Johnson or anyone, any other juror other than the foreman and a very brief question to the juror who had cursed out Ms. Johnson after the 18th. So the interviews he was relying on all took place on the 18th ex parte. And you've also raised that those interviews are ex parte as a problem, and of course that's not generally what we recommend, I think it's safe to say. But where, for instance, the government got the transcript based on one of those conversations, and you all had the transcript of each of them, why is that not enough to give you and your client what you need? Well, I'm hamstrung a little bit because there's some credibility determinations that the judge makes in terms of whether or not Ms. Johnson was truthful with him, whether she hesitated, what the look on her face was. We can't challenge those because he had done it ex parte. So now he's making a series of credibility findings that are essentially unreviewable because nobody was there in the room except him. And didn't, just to go back to this period where the judge has just, has interviewed the juror, the race-based statements were made, comes back in, doesn't mention this incident to the lawyers. The government sees the transcript and starts to move to remove the juror. Didn't the court then say, I do find there's a substantial possibility that she will base her decision on the sufficiency of the evidence, and therefore I'm not going to excuse her? You're exactly right, Jennifer. And then, to my knowledge, there is no other interaction between the judge and that juror, between that moment and the time where the judge changes his mind. Is that correct? That is precisely correct. And that's what the problem is. Because now we have two very different conclusions on the same set of facts. There are no new facts. And for this court, too, in terms of exercising his review, he doesn't come in and explain why he's changing his mind. Did I make an error of law? Did I re-weigh it? Have I gotten new information? Have I reconsidered something? He doesn't give you the kind of record you need to understand why the change. I mean, if an administrative agency decided on day one based on facts one way, and then two days later just changed it, we would call that arbitrary and capricious. In the context of removing a juror, particularly under these standards, this has got to at least create an ambiguous record, if not create the substantial possibility the juror was doing just what the court found she was capable of doing on the 18th. What about the argument that the judge dismissed this juror not because he believed that she wasn't deliberating, but because he believed that she had been dishonest with him, whereas the other jurors had been honest about what had happened? Sort of the bulk of their stories were consistent and added up, whereas her story was the only one in conflict. Yeah. And Judge Grant, and again, that could be sufficient grounds under the right circumstances for removal. But all those credibility determinations and those conclusions he made on Monday the 18th and still found it was not enough. And he made them ex parte. Pardon? And he made them after ex parte interviews. That is correct, Your Honor. Which again, we can't challenge them because nobody was there to see it. What do we make of the fact that there were also ex parte conversations happening outside of this interview between the judge and the jury, and between the judge's staff and the jury, during which one of these interactions, the judge asked the jury what the split was? That is extremely troubling, Your Honor. Did you object to that at that point or moved for a mistrial? Well, it came up at the end. I think it would constitute plain error. It kind of came up in the wash for this reason. That interaction occurred on a Friday, roughly around lunchtime. Judge didn't tell anyone about it until Monday, when he's in the middle of conducting another inquiry and says, oh, by the way, the jurors said they were deadlocked. I asked what the split was, which has been forbidden under federal law for a very long time, about 100 years since Brasfield. And that's what's troubling about that, because an inquiry into the split is necessarily coercive. We don't permit that. And the defendants and the government didn't even find out about that until Monday, when the judge happened to mention it. So there was a generalized objection made. No mistrial motion was made precisely at that time. But that's extremely troubling, and under lots of precedent by this court in terms of ex parte contacts, when you combine that with the inquiry into the split, that would be another basis on which a mistrial should have been declared. All right. Thank you very much, Mr. Cooney. We'll hear next from Mr. Sam, Mr. Poole. Good morning. Jason Poole for the United States. May it please the court. I'd just like to briefly begin, because I think I need to correct the record on the split question. The parties were informed of this on the Friday, almost immediately after it happened, when the judge, and this is on document number 959 on pages 30 and 31, the judge immediately came back, told the parties about it. There was no response, no concerns, no objection. It was brought up on the Monday following by Mr. Sinnott's counsel. This is on document number 973, page 9. In fact, at that time, although Mr. Sinnott's counsel raised it, said, you know, I don't see any real harm from this, which I think is correct. As the record shows, this was a lengthy deliberations that ultimately ends in a split verdict with one of the defendants being entirely acquitted, which, as this court has indicated, is the kind of circumstance that shows that that inquiry has no harm. So you would concede that it was error for the judge to ask the jurors the split? Yes, Your Honor. It was error. The judge should not have asked that question. However, again, it is still something where the plain error standard applies, and this court has held that, I think particularly under the third prong of plain error, that they need to show prejudice, which they have not, which the lengthy deliberations and the acquittal of Mr. Weibold demonstrates that there was no prejudice. In addition, just to be clear— —of the convictions that followed pretty shortly after the juror in question was removed. Isn't that pretty good evidence of prejudice? There was a two-fold days after Juror 26 was removed, two-fold days of deliberations, including another jury question. This was a jury that, even after Juror 26 was replaced, continued to deliberate, deliberated extensively. Given the interruptions because of Juror 26's misconduct throughout the other days of deliberations, I think the actual amount of time that the final jury deliberated was almost as much, if not more, than the previous days of deliberations. But here's the problem. Not only did the judge ask the split, because of the disruption in the jury pool, by learning the split, the judge also learned that one of the jurors at issue in this disruption was the minority, was the holdup in a verdict. And aren't we running headlong into the problem that we identified in our en banc decision in Brown, the courts must, in all cases, guard against the removal of a juror who aims to follow the court's instructions based on his view of the merits of the case. How is this not a problem? Because now the judge knows this juror is the holdout, is one of the holdout jurors. So just to be clear, Your Honor, the judge does not learn who, at that point, there may be, it appears there is not just a holdout, there is a multiple votes on each side. The judge doesn't learn who is on those sides. The judge, at most, learns later, probably on Monday, that juror 26, and we agree, the judge does learn that juror 26 is likely not going to vote to convict. I'm not sure it matters very much that there is a lapse in time between when the judge learns the split and when the judge learns that the juror at issue is part of the holdout group. To the extent that I don't think it does, again, Your Honor, and I think I would note that to go back to, okay, so what is the harm here? Whether juror 26 was removed, I think it's, I would also like to make clear sort of what is the timing, what is the basis for the judge's decision? And why does the judge ultimately reconsider his decision? I mean, that seems like a big problem to me, right? Because he ultimately determines that she's not credible, that she's lying about everything except for her statement about, I'm a white person standing up for white people. But he made these inquiries at a time when counsel wasn't present, defense wasn't present, nobody saw anything on the faces, on the face of the juror, and originally when he comes back, he doesn't say anything about that statement or her truthfulness about that. I mean, how is the defense supposed to be able to have any kind of questioning of that? So Your Honor, just to be clear here, so first of all, before the judge interviewed those jurors initially in camera, so I would say in camera because the government was also not present, it wasn't like the defense only was excluded. Well that's true, but right now we're talking about prejudice to the defense, to the defendant's right. Of course, Your Honor. But, so before those interviews, the judge solicited questions from the parties. The judge had those interviews transcribed and recorded. But here's the problem. Tell me how transcribing the interviews or even asking for questions beforehand addresses the fact that he's making a decision based purely on demeanor and credibility and not on the actual words that are said, and nobody else is there to be able to see what her demeanor is. How are they supposed to challenge that? Two points, Your Honor. The judge is not entirely based just on credibility. The judge here was engaged in a classic fact-finding exercise to which this court defers. The judge had to resolve disputes between two stories about what happened. So to be clear, Juror 26 not just said that she was a white person standing up for white people. Before that, she made a false accusation that another juror had made statements that he was going to make deliberations based upon race. The judge inquired into that. When the judge interviewed Juror 26 about that, you can see even from the record itself that she is unwilling to talk about what happened. She's unwilling to name names. You can see even from the record itself, it shows she's someone who didn't think she was going to have to actually explain the story she made up. She eventually identifies three people that she says were there, one of them the person she'd had issues with before as the person now in this lunch conversation she had fortuitously walked into but never brought up before. The judge interviews the two jurors that did not make the statement but were supposedly present. Both of them confirm that no such statements were ever made. That what Juror, and essentially then, what Juror 26 made was a false accusation. So this is based not just upon the- I mean, I think all of this would have a lot more force if A, the parties were present when this happened so they could evaluate the demeanor or have some way of challenging it. And B, you know, this happens like two days after or three days after he denies the motion and just sort of sua sponte with nothing new happening. I mean, that seems problematic to me. So I would, in that respect, I would especially, I think it's point to point too. So document number 734 is the judge's written order in this case where he explains, you know, how much this weighed upon him. That this was something where his initial inclination was not to remove the juror and that was because the judge respected the high standard in Brown. It was also, at the time, the primary focus was on a separate question that Juror 26, who had literally walked out of the jury room, was not deliberating. She had made other comments indicating, quote, she couldn't put some old men in jail for the rest of their lives. So the judge's focus in these initial questions, initial decisions, was more upon that. The judge, to be clear- But just to be clear, during the course of the deliberations, there's also information coming out of the jury that originally there's an agreement on one of the counts. And then there's an agreement, now there are up to nine counts that they agree upon. And then we have the judge's statement that he thinks there is a substantial possibility that she will base her evidence, she will base her verdict on the evidence. What do we do with all of that? Well, so first of all, the judge never wavers in his factual findings about Juror 26's lack of credibility, and in particular that she made a false accusation accusing another juror of making race-based deliberations. That's the first time that there's been any notion that race-based deliberations could be an issue, and it was a false accusation by Juror 26. And it's that accusation coupled with her statement that shows she was clearly basing her deliberations on race. I will say that to me that's a spot where I think that her demeanor could be useful for assessing her statement, because as I see her full statement, she's criticizing her fellow jurors, saying they should be looking at the facts in this case, not worrying about those things. So I don't think it matters the color of their skin or their financial status or how entitled they think they are. I don't think those things matter because that's not what's the issue at this case. So I do feel like I'm not necessarily being discriminated against, but I am a white person standing up for white people. Now that could mean I am standing up, I am affirmatively standing up for these people because they are white and I am white. Or it could mean I think that they, these jurors that I'm in opposition to, see me as a white person standing up for white people rather than someone who's looking at the evidence. And it seems to me that particularly in combination with her first statement that the color of their skin doesn't matter, that her demeanor when making these statements could be very important to assessing her credibility on that or assessing what she really meant. What's your response to that? Two things, Your Honor. So first of all, just before the portion you quoted is when, again, part of the context of this is she makes a false accusation accusing a different juror of making racial motivated statements. So that's part of her... So we know that that's what the judge concluded. I mean, I wasn't in the jury room, right? So I don't actually know what happened. So relying on that credibility determination, yes. But I don't know that we can take that as a fact equivalent to the sky being blue, right? These, I mean, there are jurors making different kind of allegations against one another. We have to look at them, I think, all together. And I guess also just the second point to address more directly the credibility and the looks on someone's face, even if the other parties, the government and the defense, were there, the judge ultimately is the fact finder. The judge is the one who's the neutral decision maker looking at the person and trying to determine their credibility. That's the judge's role. And the parties here, again, had the opportunity to propose questions and discuss it afterwards. This is also, again, not just about credibility in the sense of judging someone's demeanor. Again, the judge on every respect, any time Juror 26 made a statement about something that happened, any of the jurors that the judge questioned, their story was that, no, what Juror 26 said was not true. On every respect, on every question where this could be verified, Juror 26 was confirmed to have made false accusations, to have falsely denied making statements to other jurors. But see, that's entirely a credibility determination. One person could be telling the truth and three people could be lying. It's not a numbers game. The judge, when he's having these ex parte conversations, determining that this, the juror at issue, I think Juror 26 is a liar, is making determinations. You yourself, as you stand here today, are also running with those determinations. You are saying, she didn't want to talk about the statements that the other jurors made. So she must, she wasn't prepared to, she must be lying. Sometimes people are like, you know what, I heard somebody say some bad things and I don't want to talk about it. There's an entirely different reasoning. The judge is making credibility determinations and you are embracing those. But the problem is, what is the defense supposed to do? They didn't see that and all they have is a transcript. And Your Honor, again, that's, I think, if they had been there, they might have been able to see it, but they would not be the fact finders. Like the fact that they could say, I disagree, Your Honor, I don't think that look meant that. That wouldn't change how the judge viewed or assessed or made his own credibility determinations. They are not fact finders, they are not witnesses. And the judge, this is an experienced trial court judge, even after Brown, this court confirmed, these kind of factual determinations, and especially these kind of credibility determinations, are committed to the trial court and that's the kind of role the trial court was exercising here. One follow up on that, isn't the ordinary practice, if racial factors are deemed to have infected the jury's deliberation process, I think it's more typical to declare a mistrial rather than to excuse one juror, right? Because if, let's say that this juror was, you know, letting her view of race infect this case, and let's say that other jurors noticed that and found it problematic, doesn't that mean that the whole, even if everyone else was being sincere, doesn't that mean that the whole process was pushed off track and we needed a mistrial? No, Your Honor. So I'd point the court's attention to this court's decision in Maraval, is also indicating that the question is whether that actually influenced the decisions. And here, in particular, Juror 26's bias was uncovered before there was a verdict. So she was removed before there was a verdict. It's not a question of impeaching a verdict that had been reached. But it could have, it could have infected the entire deliberations is the problem here, right? I mean, that's, if race had been injected into the deliberations, removing one person, especially when you have this back and forth, and I understand your position is, you know, she was lying, but removing one person doesn't necessarily cure the problem, does it? So two points, Your Honor. Juror 26, again, so her false accusation was made to the court, not directly to other jurors. And secondly, after the verdict, the court polled each and every one of the jurors, all 12 jurors who issued the verdict, which included acquitting a white co-defendant, indicating that one race was not a factor. And in their answers, all of the polled jurors stated that race had no bearing on their verdict, and also, again, stated that no one had made statements about race-based deliberations like the ones that Juror 26 had made, confirming, again, that every single juror, all of the jurors confirmed that Juror 26's accusations were false. All right, before you sit down, I just want to ask you one other series of questions, because I want to make sure I understand your position. Um, would you agree that it was error for the district judge here to question the jurors'  Uh, no, it was not error, Your Honor, and I would point that this court has said in Cameo and Caldwell that there is no blanket rule about in-camera questioning of jurors. And here, the district court, who had already, on the Friday, had had an in-person, or sorry, in-court brief interview with the foreperson about Juror 26's walking out of the courtroom, her first instance of misconduct, based upon that prior experience there— Well, let me stop you there. Do you think that was error? No, Your Honor. So that was— Without any transcript of what happened or anyone present? No, this was in—that was in court. Where the judge—the juror 26 had been reported, I think had been seen by a court security officer or a deputy as having left the courtroom. The judge inquired in open court with all the parties present, uh, what had happened to figure out what was going on. So that was not in the camera interview, but based upon that experience, the court made a finding—this is on Document 973-55—the court made a finding based upon his experience, including that prior interview, that he was more likely to get to the truth if he had these interviews in camera, and that it would also be less oppressive, which I think it's important to note that this was approximately around 15 attorneys in the courtroom at the time. So the court made a factual finding in line with what this court has said in Kameho and Caldwell that the court has discretion to do, and the court also hewed to this court's commands that if he does do in-camera examinations, which this court has allowed, he needs to transcribe them and discuss them with the parties, which he did, and he also gave them again an opportunity to propose questions beforehand. So he followed this court's guidance, the discretion this court has given them, and so no, Your Honor, I don't think it was error for the court to have conducted in-camera interviews. All right, thank you very much, Mr. Poole, and Mr. Samuel, you have six minutes. All right, thank you, and we do ask this court to affirm. Thank you. Good morning. May it please the Court. My name is Don Samuel. I represent Jim's Senate. I also will be devoting my argument to the issue of the improper excusal of Juror Number 26, Ms. Johnson. Let me begin by addressing some of the same issues that have been addressed by the court. The fact that the judge was making credibility findings, there's no question that he was making credibility findings, not just based on what was said, not just based on the different statements being made by different jurors when they're all being questioned, ex parte, back in chambers, but he also says, I'm looking at body language. He says it all three different days. He says, I'm making credibility decisions, and finally, he says, I could tell by the look on her face, talking about Juror 26. But to the point of your friend on the other side, would you have really been able to file a motion based on your, to successfully file a motion based on your differing interpretation of the look on a particular juror's face? I think had we been present, we would have been able to talk to the judge, and he was very communicative with us, with the lawyers. We could have said, Judge, we'd ask you to clarify. You've made a factual finding that that one sentence, the same sentence that you just quoted, Judge Graham, where she says, look, I am white, and these are white defendants. The tone of voice, the context, all of that would have prompted anybody to say, just like you did, there's some ambiguity there. We don't know what she meant by that. And it could be that what she meant was, it's just a fact that I'm white, but I don't think I'm being discriminated against. The judge brought the topic up. He said, do you feel like you're being discriminated against? And she said, no, no. I am white. The defendants are white, but I don't feel like I'm being... Had we been present for that, we would have said, Judge, first of all, we shouldn't be doing this ex parte. You shouldn't be doing this without the defendants and the lawyers being allowed to observe what's happening, and you should be inviting us to clarify these ambiguities. We wouldn't be here today had the ambiguity been clarified. Let me ask you a question, though, related to that, getting back to what Mr. Poole said. I mean, if... And we have, you know, we haven't said it's per se error to question a juror ex parte. Agreed. And so, this would effectively make it per se error to question a juror ex parte if the court based its determination on anything other than what's transcribed. I mean, that would sort of be the effect of what you're asking us to do, it sounds like. Or maybe it wouldn't, and you can explain why. I think the district court judge has to decide what is the necessity for having an ex parte communication. A lot of the cases where the ex parte communications are permitted involve a juror who wants to talk about a health issue or has to, you know, wants to talk about... Something personal and private. Something personal. My child got kicked out of nursery school or, you know, whatever. There's something personal I don't want to have to explore in front of so-called 50 lawyers in the courtroom. There are cases where there are very limited, very limited discussions with a juror. And I don't know that in those cases, first of all, I don't know whether someone objected, you know, contemporaneously, and I don't know whether a need to clarify was even necessary. In this case, it was essential to be able to clarify. And it's important to note that the accusation that Juror 26 made about the other jurors wasn't that in the jury room they were engaged in racial animus. She was talking about something she overheard in the lunchroom weeks earlier. That's the supposed lie. That's the supposed misrepresentation that the judge ultimately found and the DOJ lawyers were arguing against. She was asked, do you, is there any kind of racial animosity or is there a racial problem back there? And she said, no. But I do want to tell you that a couple weeks ago in the lunchroom, just two or three jurors were talking and I, and she was reluctant to tell the judge this. She wasn't trying to exploit this lie that she was supposedly telling. I heard a couple jurors and one of them said, these rich white guys are, you know, I would never, something like that, rich white, elitist white people. And then later the judge calls them back in, ex parte, the supposed people, she's trying to remember who was in the lunchroom that day. It had nothing to do, nothing to do with the deliberations in this case. At no time did the judge ever try to clarify what the juror meant and whether she was a racist. At no time did any juror, all the jurors who were ex parte being questioned back in chambers, not one time did a juror said there's a racial problem back here. And yet ultimately, the judge says, I'm throwing this juror out because of her racism. And yet no juror said there was any racial problem. It's the exact opposite of Colorado versus Pina Rodriguez, where the Supreme Court of the United States said, in order to set aside a verdict, which is different than this, but in order to set aside a verdict, there has to be explicit racial animus that motivated a decision. None of that happened in this case. There was not even a discussion of race back in the jury room. According to every juror, I'm sorry, according to every juror who was questioned, there was no issue with regard to that. So back to Judge Rosenbaum's question, the rule that you are advocating for, let me make sure I understand it. Are you just saying in this circumstance, this ex parte conversation between the judge and the juror, because it was ambiguous at best, that wasn't enough reason to remove the juror? Or are you asking for a broader rule that, save for personal questions, when the juror may want to be removed sort of voluntarily, if you're in the world where a mistrial might result, or the juror might involuntarily be removed, then the judge should not conduct this inquiry outside of the lawyers? I think the ex parte nature of the communication needs to be evaluated on a case-by-case basis. I don't think you can fashion a rule that says, under no circumstances ever should you have an ex parte communication. If it's personal, if a juror says, I won't answer your questions in public, I think in that situation, Juror Johnson never said she wouldn't talk in public. She was never interviewed in public. Not one time over the course of the five days of deliberation did we even see her. She was just plucked out of the jury room and brought back to chambers. So the rule you would advocate for is perhaps district court judges need to be very, very careful before they do that. Very reluctant, and especially if it's not a personal, if it's a personal issue, I don't think anybody would care. I mean, you're going to find out right away, you know, she had a heart attack. But in a case like this, it should be absolutely essential. Thank you. We ask you to reverse the conviction. All right. Thank you very much. And our next case is United States.